IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:24-CV-166-BO-KS

| | | |
|---|---|---|
| MARCUS E. MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| TOWN OF SCOTLAND NECK, | ) | |
| NORTH CAROLINA | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on defendant's motion for judgment on the pleadings [DE 19]. Plaintiff has responded [DE 21] and defendant has replied [DE 24]. A hearing was held before the undersigned on August 26, 2025. In this posture, the motion is ripe for ruling. For the following reasons, defendant's motion for judgment on the pleadings is denied.

BACKGROUND

Plaintiff Marcus Morris, an African American man, was employed as a police officer by the Town of Scotland Neck from January 13, 2018, until October 15, 2024. [DE 9, ¶ 4]. His amended complaint [DE 9] alleges the following. In June 2021, plaintiff applied for a vacant Sergeant position within the police department. *Id.* at ¶ 15. The Chief of Police, John Tippett, told plaintiff he would have to complete a Sergeant's exam and sit before a formal panel to be considered for the position. *Id.* Plaintiff took the exam but never received his results and never attended a formal interview. *Id.* at ¶¶ 17–18.

After plaintiff expressed interest in the vacancy, Chief Tippett contacted a white, part-time police officer named Gary Knight. *Id.* at ¶ 19. Tippett told Knight he wanted him to return to full-

time work and, eventually, to assume the vacancy. *Id.* He also told Knight that plaintiff "wouldn't get the position and they needed to make it look like it didn't have anything to do with race." *Id.* at ¶ 20. Tippett assured Knight that regardless of his actual performance on the associated exam, his results would outperform plaintiff's results. *Id.* Tippett routinely used a racial epithet directed at African Americans, both in this discussion and elsewhere, indicating—if not actually stating—that his decision to install Knight instead of plaintiff was based on race. *Id.* at ¶¶ 20, 46.

In addition to being denied the promotion, Plaintiff received other inequitable treatment as compared to white police officers from both Chief Tippett and Captain Tommy Parker. *Id.* at ¶¶ 22–24. Plaintiff had earned various certifications to work with drug-sniffing police dogs, and the department had issued him a police dog. *Id.* at ¶¶ 9–14. Nevertheless, plaintiff was not allowed to receive K9 training. *Id.* at ¶¶ 22–24. He also endured micromanagement of his paperwork. *Id.* In June 2023, while performing his duties as a police officer, plaintiff was involved in a motor vehicle accident while pursuing a subject. *Id.* at ¶ 23. Tippett instituted a disciplinary action against plaintiff but never informed plaintiff that he had been written up. *Id.* at ¶¶ 23, 44. The disciplinary action was later determined unsubstantiated. *Id.* at ¶ 23.

In August 2023, plaintiff attended a Scotland Neck town council closed session meeting to elaborate on official complaints against Tippett and Parker. *Id.* at ¶ 25. Plaintiff and others complained, generally, of Tippett's and Parker's corrupt practices, including falsifying time sheets, involvement with known drug dealers, forbidding the execution of search warrants on select drug dealers, and purchasing narcotics for Parker's then-girlfriend. *Id.* at ¶ 27. The Town did not conduct any investigation into the corrupt practices. *Id.* at ¶ 28. After appearing at this town council session, plaintiff was subject to more alleged retaliation. *Id.* He was written up for multiple unsubstantiated disciplinary actions. *Id.* at ¶ 29.

2

In October 2023, because of the ongoing mistreatment, plaintiff tendered a two-weeks' notice to the Town manager, Thomas Everett. *Id.* at ¶ 31. Everett agreed. *Id.* at ¶ 32. Tippett, who had been on a leave of absence at the time plaintiff tendered his resignation, returned immediately and terminated plaintiff. *Id.* Plaintiff therefore would not receive any compensation for the two additional weeks he intended to work. *Id.* After terminating plaintiff's employment, Tippett returned to administrative leave. *Id.* The Town left around thirty-six hours of plaintiff's work unpaid. *Id.* at ¶ 34.

Plaintiff sought employment with the Roanoke Rapids Police Department. *Id.* at ¶ 37. He was unable to begin work there, however, because of false reports the Town made to North Carolina Training and Standards. *Id.* at ¶ 45. The Town reported that plaintiff failed to return a rifle to the department, failed to return and conduct a proper equipment inventory, failed to ensure that his police dog received proper veterinarian treatment, and that plaintiff had been written up for the car accident while chasing a criminal subject. *Id.* at ¶¶ 40–43. Plaintiff's first notice of these disciplinary actions came from Captain Gordon Williams of Roanoke Rapids Police Department in connection with his application. *Id.* at ¶ 44. All write ups were determined "unfound" by North Carolina Training and Standards. *Id.* at ¶ 39.

Plaintiff's complaint against the Town of Scotland Neck lists three causes of action: (1) violation of 42 U.S.C. § 1981 by deprivation of rights, failure to promote and discriminatory termination based on race through 42 U.S.C. § 1983, (2) Title VII retaliation, and (3) common law wrongful discharge and violation of N.C.G.S. § 143-422.2.

## DISCUSSION

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) allows for a party to move for entry of judgment after the close of the pleadings stage, but early enough so as not to

3

delay trial. Fed. R. Civ. P. 12(c). Courts apply the Rule 12(b)(6) standard when reviewing a motion under Rule 12(c). *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 375 (4th Cir. 2012). "Judgment on the pleadings is not properly granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *United States v. Any & all Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000).

**I. 42 U.S.C. § 1981**

Plaintiff asserts a claim for deprivation of rights, failure to promote, and discriminatory termination based on race under 42 U.S.C. § 1981. The same principals of municipal liability apply to § 1981 and § 1983. Defendant opposes the § 1981 claim on the grounds that the acts of Chief Tippett are not attributable to the defendant municipality. Under *Monell v. New York City Dept. of Soc. Servs.*, a local government can be held liable under 42 U.S.C. § 1983 for its unconstitutional policies. 436 U.S. 658, 690–94 (1978). Liability is limited, however, and is not available on a *respondeat superior* theory. *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). Municipal liability results only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotations omitted). Plaintiff attempts to establish liability based on the second theory—that Chief of Police Tippett was a final policymaking authority with respect to his decision not to promote plaintiff.

4

"A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Nance v. City of Albemarle*, 520 F. Supp. 3d 758, 776 (quoting *Lytle*, 326 F.3d at 471). "[T]he identification of policymaking officials is a question of state law." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)). An official does not have final policy making authority if his or her acts "are subject to review or supervision by a municipal policymaker." *Alexander v. City of Greensboro*, 762 F. Supp. 2d 764, 783 (M.D.N.C. 2011) (citing *Riddick v. Sch. Bd.*, 238 F.3d 518, 523–24 (4th Cir. 2000)).

Defendant cites the Town of Scotland Neck Code of Ordinances, contending that they reserve policymaking authority regarding employment decisions to other municipal officials than the Chief of Police. The ordinances state:

> The primary duties and responsibilities of the Town Administrator/Clerk are presented as follows: (1) Appoints and removes town department heads with the approval of the Town Board, and appoints and removes all other town employees. Employees other than department heads shall be recommended by the appropriate head of the department and approved by the Town Administrator/Clerk[.]

[DE 25-1]; Town of Scotland Neck Code of Ordinances § 30.15(B)–(B)(1). "The police shall be responsible directly to the Mayor and the Board of Commissioners." *Id.* at § 31.02. "The Chief of Police, subject to the Board of Commissioners, shall have charge of the Police Department and shall be responsible to the Board of Commissioners in seeing that the police officers faithfully perform their duties." *Id.* at § 31.05(A).

Defendant argues that the ordinances give the Town Clerk appointment power, and therefore the ultimate policymaking authority over personnel decisions, while the police chief has mere recommendation power for subordinates. [DE 20, p. 10]. Additionally, defendant notes the "Chief is 'subject to the Board of Commissioners' (§ 31.05) and the police department is

5

'responsible directly to the Mayor and Board of Commissioners' (§ 31.02), demonstrating that his authority is both derived from and constrained by superior municipal officials." *Id.*

Defendant's argument resembles the Fourth Circuit's reasoning in *Greensboro Pro. Fire Fighters Ass'n, Loc. 3157 v. City of Greensboro*, 64 F.3d 962 (4th Cir. 1995). There, the Fourth Circuit distinguished between policymaking and mere decision-making authority.

> While it is true that Fire Chief Jones had the authority to select particular individuals for promotion and even to design the procedures governing promotions within his department, this authority did not include responsibility for establishing substantive personnel policy governing the exercise of his authority. His power to appoint and to establish procedures for making appointments was always subject to the parameters established by the City. Appellants confuse the authority to make final *policy* with the authority to make final implementing *decisions.*

*Id.* at 965–66 (emphasis in original). Because the Scotland Neck ordinances give Chief Tippett the authority to design procedures by which candidates for promotion are selected and recommended for installment by the Town Clerk, this language bears on the question of whether Tippett had final policymaking authority in that respect—or whether as in *Greensboro*, the ability to design candidate selection procedures was mere decision-making authority.

In *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 559 (4th Cir. 2018), the Fourth Circuit distinguished *Greensboro Pro. Fire Fighters Ass'n*. The Greensboro ordinances expressly reserved the power to "administer all personnel programs" to the city manager, and directed him to "establish . . . such personnel rules, plans, and procedures necessary or desirable to implement the provisions of this chapter and carry out the intent of the council." *Greensboro Pro. Fire Fighters Ass'n*, 64 F.3d at 965 (emphasis omitted). Indeed, the city had adopted personnel policies. There was "no evidence in the record that the City Council or the City Manager had delegated any of its policymaking authority with regard to employer-employee relations to the Fire Chief." *Id.* The Fire Chief's authority to design the procedures by which candidates were selected for

6

employment or promotion eligibility was constrained by the policies the town had imposed on him. "Put differently, the fire chief's 'power to appoint and to establish procedures for making appointments was *always* subject to the parameters established by the City.'" *Town of Mocksville*, 897 F.3d 538, 559 (4th Cir. 2018) (emphasis in original).

The *Town of Mocksville* court recognized that a municipality should not avoid liability just because it delegated policymaking authority. If a municipality could delegate authority to control employment matters, reserve nominal oversight, and point to *Greensboro Pro. Fire Fighters Ass'n* for the proposition that the delegee is a mere decision-maker, the municipality could avoid liability in virtually every case. *See Town of Mocksville*, 897 F.3d at 558 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)). The Town of Mocksville court asked,

> If [the alleged state actor] is not the final policymaker for the Town with respect to personnel policy, and the Town has no personnel policies on the books, then who *is* the final policymaker? And whose policies have governed the employment relationship between the Town and its employees for the past several decades?

*Town of Mocksville*, 897 F.3d at 558 (emphasis in original). Defendant does not point to any Scotland Neck personnel policy controlling the Town Clerk and the Police Chief in their employment decisions. If the Police Chief was not constrained by a town policy, the question is whether the ordinances give the Town Clerk the authority to establish employment policies which control the Police Chief.

Defendant's assertion that "the Chief of Police merely has recommendation power for subordinates" [DE 20, p. 10] ignores the Chief's integral role in the appointment process. It is true, no subordinate employee is appointed without the approval of the Town Clerk. But neither does a candidate come before the Clerk for approval without the recommendation of the relevant department head—here, the Chief of Police. § 30.15(B)(1). The ordinances' scheme for appointing police officers begins with the Chief, who—note the mandatory language—*shall* recommend the

7

candidate for appointment, the Chief's subordination to the Board of Commissioners notwithstanding. *Id.* In other words, for a candidate to be employed, both the Chief of Police *and* the Town Clerk must turn their keys.

Of course, the ordinance does imply a hierarchy between the Town Clerk and the Chief of Police. The Chief's power is to recommend a candidate, and the Clerk approves the candidate. The Clerk's power to review the Chief's recommendations bears the likeness of final policymaking authority. But this oversight is a one-way ratchet. While the Clerk can reject a candidate whom the Chief recommends, the Clerk has no recourse to hire an employee without the Chief's recommendation. In other words, the Chief is the only one with the power to determine the processes by which employees are selected for promotion eligibility.

The distinction drawn in *Greensboro Pro. Fire Fighters Ass'n* between final policymaking authority and mere decision-making authority is inapplicable in cases like this one, where the Police Chief's power to establish procedures for making appointments was not subject to any parameters. *See Town of Mocksville*, 897 F.3d at 559. Tippett established the procedures for selecting promotion candidates without having to maneuver beneath the constraints of a policy set by the Town Clerk, the town itself, or anyone else. This is enough, under the rule of *Hunter v. Town of Mocksville*, to determine Chief Tippett had final policymaking authority with respect to the procedures for selecting candidates for promotion or employment eligibility.

Finally, plaintiff alleges facts sufficient to support a plausible inference that defendant, through the actions of Tippett, interfered with plaintiff's contractual interest in employment, that the defendant intended to discriminate based on race, and that but for the plaintiff's race, defendant would not have interfered with his contractual interest. Therefore, plaintiff pleads facts sufficient to state a claim under § 1981. *See Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022).

8

## II. Title VII

To state a claim for retaliation under Title VII, plaintiff must allege "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015). An employee engages in protected activity under both Title VII and 42 U.S.C. § 1981 when they oppose conduct that they reasonably believe constitutes race discrimination. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the [discrimination]").

Plaintiff engaged in a protected activity when he attended the town council session to air his complaints about Tippett. It is true, as defendant argues, that the complaint lists several topics discussed at the meeting, and none of the listed complaints are related to a Title VII protected category like race. The list of topics discussed at the meeting, however, does not purport to be exclusive, and plaintiff later—more generally—alleges that he "complained to the Town board, his supervisor's supervisor, along with other officers, [of] Tippett and Parker's conduct and mistreatment." [DE 9, ¶ 71]. Given the factual allegations of the complaint, the subject matter allegedly discussed at the meeting plausibly includes plaintiff's opposition to race discrimination.

Plaintiff alleges that following his attendance at the town council meeting, he was terminated because of his opposition to the discrimination. He sufficiently pled his Title VII claim.

## III. Wrongful Discharge; Violation of Equal Employment Practices Act, N.C.G.S. § 143-22.2

Defendant argues that plaintiff's wrongful discharge claim should be dismissed because North Carolina law does not support a wrongful termination claim based on constructive discharge.

9

While plaintiff's allegation that he was forced to resign because of mistreatment resembles a constructive discharge, plaintiff alleges that Chief Tippett returned and actually terminated his employment. As alleged, when plaintiff left the job, it was because of a real termination, not a constructive discharge. Plaintiff states a claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings [DE 19] is DENIED.

SO ORDERED, this **23** day of February 2026.

_____
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

10